UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


PAUL GAGLIARDI, INDIVIDUALLY, AND
ON BEHALF OF THE WRONGFUL DEATH
BENEFICIARIES OF REGAN GAGLIARDI                    PLAINTIFF

VS.                        CIVIL ACTION NO.: 3:20-CV-504-TSL-RPM

LAKELAND SURGICAL CLINIC, PLLC;
JONATHAN ADKINS, M.D.; JACKSON
PULMONARY ASSOCIATES, P.A.; RIVER
OAKS HOSPITAL, LLC D/B/A MERIT
HEALTH RIVER OAKS; AND JOHN DOES 1-10            DEFENDANTS


MEMORANDUM OPINION AND ORDER

Twenty-eight-year-old Regan Gagliardi died on August 9,

2018, following emergency surgery at Merit Health River Oaks

Hospital for a mechanical small bowel obstruction.  Her father,

Paul Gagliardi, individually and on behalf of Ms. Gagliardi's

wrongful death beneficiaries, filed this wrongful death action

against River Oaks Hospital, LLC d/b/a Merit Health River Oaks

(River Oaks), Lakeland Surgical Clinic, PLLC, Jonathan Adkins,

M.D., and Jackson Pulmonary Associates, P.A. (JPA), charging

that negligence by defendants in their care and treatment of Ms.

Gagliardi proximately caused or contributed to her death.  The

court previously granted summary judgment in favor of Dr. Atkins

and Lakeland Surgical Clinic, and now has pending before it for

1

decision separate motions by JPA and River Oaks for summary
judgment and by plaintiff for partial summary judgment, and
various motions to strike the testimony, or portions of the
testimony of a number of the parties' expert witnesses.  The
court has considered the memoranda of authorities, together with
pertinent attachments, submitted by the parties, and rules as
follows.

> <u>JPA's Motions for Summary Judgment, to Exclude
> Expert Opinions of Karin M. Halvorson, M.D.,
> and to Strike Affidavit of Karin M. Halvorson, M.D.</u>

Around 4:45 p.m. on August 8, 2018, Ms. Gagliardi was taken
to the ICU at River Oaks following abdominal surgery.  She was
placed on a ventilator, and JPA was consulted by her surgeon for
post-operative pulmonary care.  Plaintiff alleges that JPA was
medically negligent in its management of Ms. Gagliardi's care
and that its negligence proximately caused or contributed to her
death around 10:00 a.m. the following morning.

Under Mississippi law, to prevail in a medical malpractice
action, "a plaintiff must establish by expert testimony, the
standard of acceptable professional practice; that the defendant
physician deviated from that standard; and that the deviation
from the standard of acceptable professional practice was the
proximate cause of the injury of which the plaintiff complains."
<u>Austin v. Wells</u>, 919 So. 2d 961, 966 (Miss. 2006) (citation

omitted).  See also Miss. Baptist Med. Ctr., Inc. v. Phelps, 254 So. 3d 843, 845 (Miss. 2018) (explaining that "[e]xpert testimony is essential in medical malpractice cases" to demonstrate "how the required standard of care was disregarded" and to certify that "defendant's 'failure was the proximate cause … of the injury'" (quoting Vicksburg Healthcare LLC v. Dees, 152 So. 3d 1171, 1174 (Miss. 2014)); Estate ex rel. Campbell v. Calhoun Health Serv., 66 So. 3d 129, 136 (Miss. 2011) (stating that "[g]enerally, causation must be proven by expert medical testimony.").  Where, as here, a plaintiff's theory of recovery is based on the "loss of a chance," "[a] plaintiff cannot recover by showing a mere possibility of a 'chance of recovery.'"  Mem'l Hosp. at Gulfport v. White, 170 So. 3d 506, 508 (Miss. 2015) (citations omitted).  Rather, he is required to establish, through expert testimony, that "the failure of the physician to render the required level of care result[ed] in the loss of a reasonable probability of substantial improvement of the plaintiff's condition.'"  King v. Singing River Health Sys., 158 So. 3d 318, 324 (Miss. Ct. App. 2014) (quoting Ladner v. Campbell, 515 So. 2d 882, 888 (Miss. 1987)).  That is, "the plaintiff must offer proof of 'a greater than fifty (50) percent chance of a better result than was in fact obtained.'"  Mem'l Hosp. at Gulfport, 170 So. 3d at 508-09

(quoting <u>Hubbard v. Wansley</u>, 954 So. 2d 951, 964 (Miss. 2007)). To be admissible, the expert's opinions must be stated to a reasonable degree of medical certainty or probability, but there is no requirement that he or she use any particular language, or "magic words," "as long as the import of his testimony is apparent."  <u>West v. Sanders Clinic for Women, P.A.</u>, 661 So. 2d 714, 720 (Miss. 1995).  <u>See also</u> <u>Martin v. St. Dominic-Jackson Mem'l Hosp.</u>, 90 So. 3d 43, 48-49 (Miss. 2012) ("Mississippi jurisprudence does not require medical testimony to contain any magical words, but medical testimony is not probative unless it speaks in terms of probabilities rather than possibilities.")

Plaintiff has designated Dr. Karin M. Halvorson as an expert in the field of pulmonary and critical care medicine to testify as to the standard of care applicable to a pulmonologist/critical care physician in the setting of the intensive care management of a post-operative patient like Ms. Gagliardi, and as to defendants' breaches of the standard of care, as well as causation and damages.  JPA has moved to exclude Dr. Halvorson's expert opinions on whether any act or failure to act by JPA proximately caused or contributed to Regan's death, contending that her causation opinions, particularly as expressed in her deposition testimony, lack factual or medical support and therefore, pursuant to Federal

4

Rule of Evidence 702, <u>Daubert v. Merrell Dow Pharmaceuticals,</u> <u>Inc.</u>, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999), must be excluded.  And, it contends that since plaintiff cannot prevail without expert testimony on causation, then once her testimony is stricken, it will follow that it is entitled to summary judgment.  In a related vein, JPA has moved to strike an affidavit of Dr. Halvorson that plaintiff submitted in response to JPA's motions, because, according to JPA, her affidavit contains opinions that contradict her deposition testimony, as well as new opinions which she has not previously expressed.

In response to JPA's motions, plaintiff maintains that Dr. Halvorson's opinions, as originally set forth in her expert report and as explored and explained at length in her deposition, are reliable and are provided to a reasonable degree of medical certainty and clearly create a genuine issue of material fact as to causation, thus foreclosing summary judgment for JPA.  Plaintiff further denies that Dr. Halvorson's affidavit contradicts her prior opinions or offers new opinions and asserts that it instead merely reiterates and clarifies or explains opinions originally expressed in her report and deposition testimony.

5

Pursuant to Federal Rule of Evidence 702, expert testimony is admissible only if the proponent of such evidence demonstrates that the expert is qualified and that her opinion is both relevant and reliable.  In Daubert, the Supreme Court instructed that district courts are to function as gatekeepers to ensure that only expert testimony which meets these requirements is admitted.  Daubert, 509 U.S. at 592-93, 113 S. Ct. 2786.  JPA does not dispute Dr. Halvorson's qualifications, nor the relevance of her proposed testimony.  Its sole challenge is to the reliability of her opinion on causation.  When evaluating reliability of scientific evidence, a trial court must strive to ascertain "whether the reasoning or methodology underlying the testimony is scientifically valid."  Id.  Some of the factors the court may consider in this inquiry are whether the expert's theory or technique can be or has been tested; has been subjected to peer review and publication; has a known or potential rate of error or standards controlling its operation; and is generally accepted in the relevant scientific community. Id.  The court should also consider such of these factors as may be reasonable gauges of reliability where a witness relies, not on the application of scientific principles but "on skill- or experience-based observation."  Kumho Tire Co., 526 U.S. at 152, 119 S. Ct. 1167.  But, as the Supreme Court made clear in Kumho

6

Tire, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.  Id.  In all cases, the court's responsibility "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  Id.

The Court in Daubert emphasized that a court's gatekeeper role with respect to expert testimony is not a replacement for cross-examination or the role of the jury in evaluating credibility and the weight afforded to expert testimony.  See Daubert, 509 U.S. at 596, 113 S. Ct. 2786.  "[T]he court's role is limited to ensuring that the evidence in dispute is at least sufficiently reliable and relevant to the issue so that it is appropriate for the jury's consideration."  Puga v. RCX Sols., Inc., 922 F.3d 285, 294 (5th Cir. 2019).  "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility."  Id.  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  Daubert, 509 U.S. at

7

596, 113 S. Ct. 2786.

The court has carefully reviewed Dr. Halvorson's report and deposition testimony, and is of the opinion that, even without reference to her affidavit, her proposed testimony is reliable and is stated to a reasonable degree of medical certainty.  Dr. Halvorson testified that Ms. Gagliardi began developing respiratory complications shortly after surgery and continued to decompensate throughout the night.  She became increasingly hypoxemic (low oxygen in her blood) and developed low blood pressures, high heart rates, and a steadily rising lactic acid level.  She had difficulty with oxygenation that was leading to further hypoxia (low oxygen in her tissues) in the rest of her body.  Dr. Halvorson testified that Ms. Gagliardi's difficulty with oxygenation was traceable to an aspiration event coupled with a resulting mucus plug that "block[ed] the ability of air to get into the alveoli to participate in oxygen exchange."  In addition, she believed Ms. Gagliardi had developed a pneumothorax, which further inhibited her ability to properly oxygenate.  Dr. Halvorson maintained that although Ms. Gagliardi's death certificate listed her cause of death as sepsis due to a small bowel obstruction with acute respiratory distress listed as a contributing factor, sepsis was not the cause of death and she did not develop acute respiratory

8

distress syndrome.  She testified that Ms. Gagliardi may have developed sepsis because of her poor oxygenation, and that this may have contributed to her death; but the overriding cause of her decompensation and death by cardiac arrest was her inability to properly oxygenate, which was attributable to a pneumothorax, aspiration and a mucus plug.

In her deposition, Dr. Halvorson testified that Ms. Gagliardi was stable when she left the operating room around 4:45 p.m. and her gut "looked good," but because "she left the operating room needing 70 percent oxygen, which was not normal, she needed a better evaluation of her lungs."  JPA, as the consulting pulmonologist, had a duty to promptly investigate and determine what was causing her to require this high degree of oxygen.  Dr. Halvorson stated that it was or should have been apparent to JPA's on-call nurse practitioner, Lee Dawkins, when or soon after Ms. Gagliardi was admitted to the ICU that she "was not properly oxygenating nor ventilating," and she asserted that in the face of clear indications of the severity of Ms. Gagliardi's condition, Nurse Dawkins' failure to investigate to determine the cause of her respiratory insufficiency, specifically by failing to order a chest CT and request an in-person evaluation by JPA's attending pulmonologist, was a breach of the standard of care which proximately caused or contributed

to Ms. Gagliardi's death.

At 7:00 p.m., Nurse Practitioner Chad Barefoot took over on-call duty for JPA.  Throughout the evening, Ms. Gagliardi became increasingly hypoxemic and developed low blood pressures, high heart rates, and a steadily rising lactic acid level.  Yet, according to Halverson, when River Oaks nurse Dawn Gilmer called Nurse Barefoot at 11:00 p.m. and related her condition, Nurse Barefoot breached the standard of care by failing to order a chest CT and failing to recognize that Ms. Gagliardi's condition necessitated an immediate in-person evaluation by a pulmonologist to investigate and address the cause of Ms. Gagliardi's respiratory distress.

Dr. Halvorson maintained that had an in-person evaluation been requested, this would have resulted in the pulmonologist's performing a bronchoscopy, which would have resulted in removal of the mucus plug and gastric contents from her lung and improved her oxygenation and prevented her death.  And she further testified that while it was not visible on Ms. Gagliardi's chest X-rays owing to several factors, nevertheless, it was "highly likely" Ms. Gagliardi had developed a pneumothorax, which was why it was important to get a chest CT to determine whether a chest tube needed to be placed.  Dr. Halvorson testified that these (and other related) breaches of

the standard of care by JPA proximately caused or contributed to
Ms. Gagliardi's death because the referenced interventions -- a
timely bronchoscopy and resulting removal of the mucus plug and
gastric contents and a chest CT and resulting placement of a
chest tube -- would have improved Ms. Gagliardi's oxygenation
and prevented her death.

In its motion to exclude, JPA argues that Dr. Halvorson's
causation opinions are based on guesswork and are speculative
and hence unreliable because Dr. Halvorson, by her own
admission, lacked adequate information to determine what led to
or caused Ms. Gagliardi's death.  This position is based on a
mischaracterization of Dr. Halvorson's testimony.  Dr. Halvorson
did not admit in her deposition that she lacks sufficient facts
and medical documentation to form reliable opinions, nor did she
admit that she cannot provide an opinion on Regan's cause of
death.  She did state that because of the lack of good
documentation -- which was attributed to River Oaks' nursing
staff's failure to document Ms. Gagliardi's condition -- it was
"not entirely clear exactly what happened over the course of the
evening."  She further indicated that, in part because of the
lack of good documentation, she was uncomfortable giving an
opinion as to an exact time when Ms. Gagliardi's condition had
deteriorated to the point that it was unlikely she could have

11

been saved.  Nevertheless, Dr. Halvorson expressed that she was able to gather enough information -- albeit "through avenues that [were] a little unusual" -- to form her opinions, including her opinion as to the cause of Ms. Gagliardi's death and her opinion that Ms. Gagliardi would likely have survived had appropriate interventions been timely undertaken.

JPA further argues that Dr. Halvorson's opinions lack reliability as she has not stated with any certainty or specificity when the cascade of events that led to Ms. Gagliardi's death began or how JPA's performing a chest CT and an earlier bronchoscopy would have given Ms. Gagliardi a greater than fifty percent chance of survival.  Dr. Halvorson did state that "it was very hard to say with the skeleton documentation that occurred when it was too late to intervene on her."  But she also testified that "around midnight was probably the cutoff [for Ms. Gagliardi's having a better than fifty percent chance of survival] – it's just after midnight that we start to see a cascade that is possibly hard to intervene upon."  Thus, Dr. Halvorson clearly indicated that up until "around midnight," Ms. Gagliardi's death could have been prevented by appropriate interventions.

Ultimately, on the morning of August 9, 2021, after Ms. Gagliardi had coded for the first time, JPA's on-call

pulmonologist, Dr. Robert Middleton, evaluated Ms. Gagliardi in person.  After placing a chest tube, he performed a bronchoscopy and removed a mucus plug and gastric contents in an effort to improve her respiration.  In support of its challenge to the reliability of Dr. Halvorson's opinion, JPA points to the declaration of its own expert, Dr. Andrew M. Wilhelm, who states his opinions that a chest CT on Ms. Gagliardi "would not have identified any clinically significant pneumothorax" because she did not have a clinically significant pneumothorax; that for various reasons, a bronchoscopy would not have been effectual to prevent her death; and that her cause of death was sepsis, which was already "rapidly cascading … long before [JPA began] caring for her."  Clearly, however, the fact that JPA and its witnesses may disagree with Dr. Halvorson's reasoning and conclusions is not a valid basis to exclude her testimony.  Such disagreements may be adequately explored through the cross-examination of Dr. Halvorson and the introduction of JPA's own experts.

The court does acknowledge that some of the language used by Dr. Halvorson in her deposition when describing or explaining her opinions, e.g., "could have," "might have" and "possibly," would appear to fall short of the "reasonable degree of medical probability" standard of proof required of plaintiff.  Rather than focusing on a few out-of-context statements and instead

considering her testimony in its entirety, however, it is apparent that her opinions as to defendants' breaches of the standard of care and as to causation are expressed to a reasonable degree of medical probability.

For the foregoing reasons, the court concludes that JPA's motion to exclude Dr. Halvorson's opinions on causation is denied, as is JPA's motion for summary judgment.[1]

River Oaks' Motion for Summary Judgment and
Motion to Strike/Exclude Expert Opinion Testimony
of Heidi M. Harper, RN, BSN, CCM

Plaintiff alleges that River Oaks' nurses failed to timely and accurately communicate information to JPA regarding Ms. Gagliardi's declining post-operative condition and further alleges that improved communication would likely have resulted in timely interventions, i.e., a bronchoscopy and a chest CT and resulting placement of a chest tube, that would have corrected her problems with oxygenation and thereby prevented her death. River Oaks contends it is entitled to summary judgment because plaintiff lacks admissible evidence to show that different communication from the ICU nursing staff would have resulted in

---

[1]   As the court has found it unnecessary to consider Dr. Halvorson's affidavit in ruling on JPA's motions to exclude and for summary judgment, the motion by JPA to strike her affidavit will be denied as moot.  To the extent that JPA contends that opinions therein would be inadmissible at trial, it may move in limine to preclude such testimony at trial.

the timely performance of the referenced interventions and materially increased Ms. Gagliardi's chances of survival.  The record supports River Oaks' position.

Plaintiff has designated two experts, Dr. Halvorson and Heidi M. Harper, RN, BSN, CCM, to render opinions concerning breaches of the standard of care on the part of River Oaks' ICU nursing staff.  Plaintiff has moved to exclude the proposed testimony of Nurse Harper on the basis that she is not qualified "by knowledge, skill, experience, training, or education" to assess the care provided by River Oaks' nurses under the circumstances presented to them, as required by Rule 702 and Daubert.  River Oaks points out that Nurse Harper worked only two years in a hospital setting following her graduation from nursing school in 1997; and since 1999, she has been employed in home health care and/or as a case manager for insurers.  It submits that given her lack of direct experience providing nursing care in a hospital setting, much less an ICU setting, in over twenty years, she does not possess familiarity with the standard of care applicable to River Oaks' ICU nurses and thus is not qualified to offer an expert opinion on the care they provided to Ms. Gagliardi.  Plaintiff argues in response that despite her lack of recent experience in a hospital/ICU setting, Nurse Harper remains familiar with "vital signs, critical lab

15

results, and the importance of timely communicating with the on-call physician in an afterhours scenario." In support, he has presented an affidavit from Nurse Harper in which she declares that she is, in fact, qualified to give opinions on the nursing care rendered to Ms. Gagliardi, as "[t]he same principles and standards of care that governed [her] practice [during 1997 to 1999] were in place in August of 2018 and remain in place today." The court is unpersuaded.

The court cannot blindly accept Nurse Harper's suggestion that in more than twenty years, nothing has changed in the provision of nursing care, particularly in an ICU setting, and particularly with respect to communication with physicians. Even her assertion that nursing principles and standards applicable in an ICU setting have not changed in more than twenty years is an opinion which she does not appear qualified to offer. Certainly, she has not identified any relevant experience that would permit her to make this assessment.[2] For

---

[2]  It strikes the court that, in fact, much has changed, in ways that are especially relevant in this case, including the relatively recent advent of nurse practitioners. Nurse practitioners, which are now commonplace, were practically unheard of twenty years ago. Nurse Harper's opinions, both her substantive opinions and her opinion that applicable standards and principles have not changed since she worked in a hospital, do not account for this recent innovation in the provision of medical care.

these reasons, the court concludes that Nurse Harper is not qualified to offer an expert opinion on the nursing care provided to Ms. Gagliardi by the River Oaks nursing staff and her proposed testimony will therefore be excluded.[3]

Plaintiff has also offered opinions from Dr. Halvorson, who identified a number of what she contends were breaches of the standard of care by the nursing staff.  Dr. Halvorson acknowledged that most of these alleged breaches did not cause or contribute to Ms. Gagliardi's death, including, for example, failing to document orders, as well as anything the nursing staff did or failed to do after "around midnight," since by then, Ms. Gagliardi's condition had deteriorated to the point that her survival was unlikely regardless of any interventions that might have been taken.  Dr. Halvorson did assert that other acts and omissions by the nursing staff, and particularly Nurse Dawn Gilmer, caused or contributed to Ms. Gagliardi's death, including her undue delay in communicating to JPA Ms. Gagliardi's ABG values and vitals, which evidenced Ms. Gagliardi's worsening condition.  The court is of the opinion, however, based on the undisputed facts of record, that a jury

---

3   Nurse Harper's testimony is redundant, in any event, as Dr. Halvorson has offered essentially the same opinions as to breaches of the standard of care by River Oaks' nursing staff.

could not reasonably find that the alleged negligence of the nursing staff proximately caused or contributed to Ms. Gagliardi's death.

Dr. Halvorson acknowledged that Nurse Dawkins was made aware of Ms. Gagliardi's condition while he was on call, prior to 7:00 p.m., and yet he failed to order a chest CT or request an in-person evaluation of Ms. Gagliardi.  She also acknowledged that Nurse Barefoot, when finally contacted by Nurse Gilmer at 11:00 p.m., was provided sufficient information to alert him to the need for a chest CT and an in-person evaluation by a pulmonologist; yet he, too, failed to request either.  There is nothing in the record to suggest that better, more timely communication with JPA, through its nurse practitioners, would have made a difference.

In addition to asserting that River Oaks' nursing staff failed to promptly notify JPA of Ms. Gagliardi's abnormal vitals and ABG and other lab results, Dr. Halvorson asserts in her affidavit submitted in response to River Oaks' summary judgment motion that "the nursing staff failed to act as a patient advocate and take the necessary steps to secure an in-person physician evaluation of Regan Gagliardi," and that "but for the nurses' failures to … request an in-person evaluation of [Ms. Gagliardi], JPA would have performed an in-person evaluation or

at a minimum ordered the CT and bronchoscopy soon after her clinical deterioration."  Dr. Halvorson concludes that had the ICU nursing staff "acted as an advocate for Regan Gagliardi on August 8-9, 2018, Ms. Gagliardi's chance of survival would have been greater than fifty percent."

In its response memorandum, plaintiff asserts that this opinion, set forth in Dr. Halvorson's affidavit, merely reiterates what she stated in her written opinion and deposition testimony.  The court, however, has found in Dr. Halvorson's expert report or deposition no hint of an opinion that River Oaks' nursing staff breached the standard of care by failing to advocate for Ms. Gagliardi by "taking the necessary steps to secure an in-person evaluation" of Ms. Gagliardi or that the nursing staff's failure to secure an in-person evaluation by a physician proximately caused or contributed to her death.  Dr. Halvorson stated repeatedly that *Nurse Dawkins and Nurse Barefoot* breached the standard of care, and proximately caused or contributed to Ms. Gagliardi's death, by failing to request an in-person evaluation by JPA's on-call physician; but she did not contend that *River Oaks' nursing staff* had a duty to secure an in-person evaluation of Ms. Gagliardi.  Since this opinion was not previously expressed by Dr. Halvorson, River Oaks might not have been expected to address this issue in its motion for

19

summary judgment.  Inexplicably, though, its rebuttal does not address the issue either.[4]  Despite this omission, the court is of the opinion that River Oaks is entitled to summary judgment.

In her affidavit, Dr. Halvorson does not indicate what "necessary steps" the nursing staff should have taken to secure an in-person evaluation of Ms. Gagliardi by a physician.  She seems to contend, at least implicitly, that the nursing staff should have requested an in-person evaluation by JPA, as she states that JPA would have performed a timely in-person evaluation of Ms. Gagliardi "but for" the nursing staff's failure to timely request such an evaluation.  Indeed, since according to Dr. Halvorson, Ms. Gagliardi was experiencing difficulties with respiration and ventilation and needed to be seen in-person by a pulmonologist, then a JPA pulmonologist presumably would have been the logical choice for an in-person evaluation.  But River Oaks' nursing staff was actually in communication with JPA, through its nurse practitioners.  Dr.

---

4    While Dr. Halvorson's affidavit as to River Oaks would be objectionable on the basis that it contains new opinions not previously expressed, River Oaks has not moved to strike this affidavit.  River Oaks has joined JPA's motion to strike a separate affidavit of Dr. Halvorson which plaintiff submitted in response to JPA's motions for summary judgment and to exclude Dr. Halvorson's causation opinions.  Oddly, though, River Oaks has not moved to strike Dr. Halvorson's affidavit submitted in response to River Oaks' own summary judgment motion.

Halvorson does not state what the standard of care required under these circumstances.  She does not state, for example, that the standard of care required that the nursing staff communicate directly with a JPA physician; and the evidence is that they lacked the means or authority to do this is in any event.  Nurse Barefoot testified that a nurse wishing to communicate with a JPA physician would have had to come through the on-call nurse practitioner; and plaintiff has presented no proof that a demand by the nursing staff to JPA's nurse practitioners would likely have resulted in an in-person physician evaluation.  In the absence of such proof, plaintiff cannot prevail.  For this, and the foregoing reasons, the court concludes that River Oaks is entitled to summary judgment.

<u>Plaintiff's Motion for Partial Summary Judgment</u>

Plaintiff has moved for partial summary judgment on his charge that Chad Barefoot breached the standard of care by practicing without a protocol or practice guideline in place. In support of this motion, plaintiff relies on the expert opinion of his nursing expert, Donald Bucher, who asserts that the applicable standard of care "requires nurse practitioners to practice within the parameters of a collaborative practice agreement so as to clearly define their responsibilities and limitations of their practice."  Bucher opines that Barefoot

21

breached this standard of care "by failing to have a collaborative practice agreement in place with his employer/supervising physicians."  The court will deny this motion.  While JPA may not have had a formal written collaborative practice agreement with its nurse practitioners, JPA physician Robert Middleton, when describing in his deposition the nature of the everyday working relationship between JPA physicians and nurse practitioners, did state that there are guidelines and practice criteria which have developed and are followed every day, whether the nurse practitioners are working side-by-side with physicians in the hospital setting or whether they are on-call with a phone.[5]

<u>Motion to Strike Expert Testimony of Bill Brister, Ph.D.</u>

Plaintiff has designated an economist, Bill M. Brister, Ph.D., to calculate the present net value of Ms. Gagliardi's future lost wages.  JPA, joining the motion of River Oaks, seeks

---

[5]    It may be doubtful that this arrangement would satisfy the requirements of state law, and in particular, Mississippi Code Annotated § 75-15-20(3) (stating that an "advance practice registered nurse may not practice as an APRN if there is no collaborative/consultative relationship with a physician or dentist and a board-approved protocol or practice guidelines.").  However, plaintiff has made clear in his rebuttal that his motion is not based on a violation of this statute but rather on the opinions of his experts, including Donald Bucher and Dr. Halvorson, who adopted Bucher's opinions about the standard of care and added her own opinions on causation.

to strike his opinion as unreliable, contending that his use of a national average rather than Ms. Gagliardi's actual earnings history to establish the base income for his calculation contravenes the Mississippi Supreme Court's holding in Rebelwood Apartments RP, LP v. English, 48 So. 3d 483 (Miss. 2010), and additionally arguing that his calculation is based on the speculative assumption that Ms. Gagliardi would have completed a degree in medical coding and obtained employment in that field; improperly using a work-life expectancy of 30.26 years rather than 28 years; and used an unfounded personal consumption rate based on the speculative assumption Ms. Gagliardi would have lived in a two-person rather than one-person household.

Rebelwood is correctly interpreted as holding that "*as a general matter*, the calculation of lost income stream must 'rely[ ] on the [injured's] actual earnings' in most cases, as opposed to national averages." James v. Antarctic Mech. Servs., Inc., No. 3:18-CV-678-CWR-FKB, 2020 WL 1479090, at *1 (S.D. Miss. Mar. 26, 2020) (emphasis added).  In the court's view, however, there is no merit in JPA's suggestion that the Mississippi Supreme Court in Rebelwood mandated the use of a decedent's actual earnings history as the base wage for a lost wages calculation and categorically rejected the use of an "earning-capacity" approach, except in cases involving young

23

children, who have no earnings history.  See Littlejohn v.
Werner Enterprises, Inc., No. 1:14-CV-00044-SA-DAS, 2015 WL
3868092, at *5 (N.D. Miss. June 23, 2015) (rejecting defense
argument that "Rebelwood requires the lost future earning
calculation to begin and end with the decedent's previous
income, and that any projected changes in circumstances that
would increase the decedent's income are too speculative.").
And as Judge Mills aptly observed in Person v. Ford Motor Co.,

> predicting exactly how much a given individual would
> have earned in the future is largely a matter of
> guesswork under even the best of circumstances.  The
> future course of an individual's work life is not set
> in stone, and this is particularly true in the case of
> young adults ….  This leaves both sides with some
> leeway to provide the jury with their own version of
> the most likely future events, had an accident not
> occurred.

No. 3:09CV133-MPM-DAS, 2011 WL 10501606, at *9 (N.D. Miss. Oct.
13, 2011) (plaintiffs' economist was "not required to assume
that [the plaintiffs] had a lifetime of indigence awaiting them,
based solely upon what transpired in the early years of their
work careers.").  Ms. Gagliardi was twenty-eight years old when
she died.  She had a work/earnings history; but she also had
plans to do more -- and earn more -- and was taking steps toward
achieving more remunerative employment.  Given her circumstances
at the time of her death, the court here does not view Dr.

Brister's predictions about Ms. Gagliardi's future work life as being overly optimistic.

As for defendants' remaining objections, Dr. Brister explains in an affidavit submitted in response to JPA's motion that the base wage (and work-life expectancy) he used in making his wage loss calculation was based on Ms. Gagliardi's having previously obtained her associates degree and did not assume she would have completed a second degree in medical coding.  He further maintains in his affidavit that widely-accepted statistics fully support his assumption that she would have lived in a two-person household.  Particularly in light of his affidavit, the court is satisfied that Dr. Brister's proposed testimony is reliable and therefore, JPA's motion to exclude will be denied.

Plaintiff's Motion to Strike Causation Opinions of
JPA Nursing Expert Kayla Hood

In response to plaintiff's motion to strike causation opinions by JPA's nursing expert Kayla Hood on the basis that in Mississippi, nurses are not permitted to offer opinions on medical causation, see Mid-South Retina, LLC v. Conner, 72 So. 3d 1048 (Miss. 2011), JPA concedes that it will not call Kayla Hood to offer testimony on causation.  Accordingly, plaintiff's motion will be granted as confessed.

Conclusion

Based on the foregoing, it is ordered that JPA's motions for summary judgment [Dkt. 109], to exclude the testimony of Dr. Karin Halvorson [Dkt. 107] and to strike Dr. Halvorson's affidavit [Dkt. 129] are denied; River Oaks' motion to strike expert testimony of Heidi Harper [Dkt. 104] is granted; River Oaks' motion for summary judgment is granted [Dkt. 112]; plaintiff's motion for partial summary judgment [Dkt. 99] is denied; plaintiff's motion to exclude the causation opinion of Kayla Hood [Dkt. 101] is granted; River Oaks'/JPA's motion to exclude testimony of Bill Brister, Ph.D. [Dkt. 102] is denied.

SO ORDERED this 7th day of December, 2021.


/s/Tom S. Lee
UNITED STATES DISTRICT JUDGE